May it please the court. I'm short. May it please the court. My name is Kristen Boyles, and I represent Appellants Oregon Natural Resources Council in this case as well. I would like to save five minutes of my time for rebuttal. There is only one issue before your honors this morning, and that is the invalidity of the incidental take statement in the challenged biological opinion, because it does not actually limit take of threatened northern spotted owls from logging. And on that one issue, I have three points to discuss. First, that the Endangered Species Act requires that incidental take statements both authorize and set a cap on take of protected species. Second, that this incidental take statement fails to set a cap on how many owls may be taken and provides no trigger for reinitiation of Endangered Species Act consultation. And third, that this incidental take statement, one that merely restates the project scope, cannot provide an independent check on the Fish and Wildlife Service's projections. Turning to my first point, while the service argues that incidental take statements function only to lift the bar on take, the plain language of the Endangered Species Act, its legislative history, its regulations, and the opinions of this court dictate otherwise. An incidental take statement is issued under Section 7 of the Endangered Species Act. The whole analysis under Section 7 is to ensure that federal actions don't cause jeopardy to a species, in plain language, to make sure that the species is not at risk of extinction. Under the Endangered Species Act, risk must be borne by the project. In this scheme, incidental take statements at first seem like an anomaly, because they are permits to take, to kill, or to harm a certain number of otherwise protected animals. Here we're talking about northern spotted owls. But an incidental take statement also acts as a check on the service's jeopardy call. In essence, it ensures that that jeopardy call was correct. And for this reason, incidental take statements must specify the impact for the take, they must contain measures to minimize and mitigate for the take, and if the authorized take is exceeded, the regulations require the agencies to reinitiate consultation to redo the jeopardy analysis before the project goes to completion. The easiest way to quantify take is to have a number of animals that you actually count. Congress recognized that that may not be possible in all instances, and then said that there was a possibility of a surrogate allowed for take, using as an example a number of endangered fish eggs that might be sucked into a pump from a water project. As long as that surrogate is linked to an actual number of animals that is allowed to be taken. This court held in Arizona Cattle Growers that incidental take statements must contain that kind of trigger, a trigger that when reached shows an unacceptable level of take has occurred and consultation must be reinitiated. As one district court has stated, the purpose of establishing permissible take levels is to ensure that even if a project is implemented in strict accordance with its plan, it will not result in an amount of harm that was unpredicted by the agency and that requires a new look. The statement here relates to geographic territory rather than numbers, but what if there were evidence that invariably there are 14 animals per acre, and that's just how they choose to live in this area. If that were so, then could an acreage designation be a permissible surrogate as well, unless there is evidence that the animals suddenly are 25 per acre? Absolutely, Your Honor. An acreage could be, a habitat could be a surrogate if it is not the same amount of habitat that is planned to be logged by the project. Right now, in this incidental take statement, the plan for logging of owl habitat is 22,227 acres. The amount of acreage that's used in the incidental take statement is 22,227 acres. Well, let me use a smaller example so I can do the math. I'll go back to my 14 animals, and let's say there's 10 acres, and so you can figure out that's 140 animals, and the determination is that 140 is an acceptable level, and so 10 acres is the project, and 10 acres is okay. Then it wouldn't be okay, Your Honor, because then you would have no trigger and no check on whether you would need, whether your guess that that many number of animals, 140 animals, was a correct number that could be taken and not cause jeopardy. So in my example, it would have to be accompanied by something that says, unless there is evidence that, you know, the level rises to 15 animals per acre, and then they have to go back and rethink it. There has to be a trigger at which the agency would have to reinitiate consultation, which does not come at the actual end of the project. In your example, in this case, in a scenario where you only have one or two animals that are considered to be killed, what's happening here is there is no trigger because when they reach the end of the project, they will have reached the amount of take that's authorized. Otherwise, it's a tautological issue. It's entirely tautological. When you say there has to be a trigger, do you mean a specific number? I don't mean a specific number, Your Honor. It could be a habitat surrogate, but it could be a percentage of canopy closure for owls that has been degraded. It could be number of abandoned owl nest sites. It could be any number of things, but it has to be something that's separate from, we have now completed the project. Because otherwise, re-initiation would be meaningless. It's totally meaningless. My example that I've been using in my office is if you have, if a doctor, if you wanted to run a marathon and a doctor decided that you weren't quite sure if this was going to be good for your health or not, and the doctor said, okay, stop running when you finish the marathon, no check at all on the wisdom of you running that marathon. But if the doctor says, stop running if your pulse goes to 160 beats per minute or if you can't catch your breath, then you have a check on whether or not you should finish running the marathon. This is what we have here. This incidental take statement allows the take of all owls associated with the project. That is no trigger at all. That is no check at all on how many owls can be taken. There will never be re-initiation of consultation under this incidental take statement. Not only there were, but there can't even theoretically be. There can't theoretically. Let's say we get to all owls, which, of course, isn't a limit. I mean, that's a separate problem in and of itself. All owls could be 3 or 300 or 3,000 owls. If there were 3,000, we might not have to worry about that. If there were 3,000 owls, I might not be standing here, Your Honor. But that all owls isn't a limit. But the other, even if you could get to all owls, you can never get to the limit because you will have finished the project. The project will be done when they finish cutting the number of acres that are specified in the incidental take statement. That really is my argument on the fact that this has no cap. That's the all and no trigger. That's the amount of acreage. Any incidental take statement, which merely repeats the project scope, cannot provide the functions within the statutory scheme that an incidental take statement is supposed to fulfill. In specific environmental contexts, the service does this frequently. The service has proposed incidental take statements for threatened links from development where they can't count the links, but they'll talk about the amount of acreage that's been destroyed specifically for migration. For salmon, incidental take statements have been issued that use a take surrogate of the extent of muddy water in a particular stretch of river from a timber harvest because you can measure that where you may not be able to count the actual number of salmon. The question isn't whether or not they needed to have an actual number here, which the briefs have fixated on, or whether they can use a surrogate. I will submit it's easier to have a number. I think it's easier to count the number of owls than it is to have a surrogate. But the surrogate's not the problem. It's the fact that you don't have a limit at all in this incidental take statement. The service's argument on this issue rests on its current interpretation of the regulation that defines the statutory language of impact. The language in Section 7b-4 is impact. The regulatory language defines impact as the amount or extent of taking. Given that incidental take statements focus on individual members of a species, given that the regulations defining when consultation must be reinitiated require that, if you go over the amount of take, and given this Court's discussion in Arizona Cattle Growers for the preference for a number and how tailored a surrogate must be if no such number is available, extent cannot seriously be read to correspond to the extent of the project. Extent is clearly talking about the extent of taking of the species. And the agency's interpretation of its regulation is subject to deference only if it is reasonable. And we submit in this instance it is not reasonable because their interpretation reads out the regulation about reinitiation of consultation. That's 50 CFR 402.16a. It also makes a mockery of the idea that you would have to minimize and mitigate take during an incidental take statement and monitor the take during an incidental take statement. Your Honor, because the incidental take statement violates these portions of the Endangered Species Act, we've asked you to reverse the decision of the district court and declare the challenged incidental take statement invalid. And I will reserve the rest of my time. Well, let me ask you one quick question about that. If we were to agree with your basic argument, would we directly invalidate the statement or would we return it to the district court just in terms of the tagline? What's the bottom line? Bottom line, directly invalidate the statement, Your Honor. If the statement is invalid, there's nothing left for the district court to look at. It's a question of law. There are no other facts at issue here. The statement and, in fact, the biological opinion, they are one, as we've argued in our briefs, they are inextricably linked, should be invalidated. And that's the request we would ask of Your Honors. Thank you. Mr. Smith? May it please the Court, I'm Justin Smith for the United States. With me at counsel table are Diane Hubler of the Solicitor's Office of the Interior Department and Brendan White of the Fish and Wildlife Service. Welcome. At the start, I'd like to correct one factual point in the record. Footnote 10 of the plaintiff's reply brief suggests that this project involves over 300 owls. And, in fact, if you look at page 13 of the biological opinion, it says that the average owl pair nesting needs 3,300 acres. And on page 341A of the supplemental excerpts, it says that the owls don't overlap. So if you do the math, you can see you're actually looking at fewer than 10 owl pairs are implicated by these projects. The numbers in that footnote are from a table that talked about the entire area where this could occur. Well, since you've just neatly explained the number of owls, why doesn't the SOTX statement have a number of owls? A couple reasons, Your Honor. The most important one is the way it works, you almost never see a dead owl. What happens is, there's encroachment on the habitat of a nesting pair. Some pairs do fine. Some pairs, they may have less reproductive success, and so fewer offspring. Some pairs move, and they go somewhere where they have, maybe they're too crowded, there's predation. The way that things actually function as a practical matter, to the extent there are effects, they may be three years away or 100 miles away. So there's no really good way to measure what the actual effects are on the species from the action. Acres are a great prospect. The thing about the owl is that it desperately needs habitat. If you take a block of habitat, you take away the owls, the owls will repopulate. Take away the habitat, no repopulation. So the key for the owl is the suitable habitat, Your Honor. Well, but you're, if that is, I understand that that's your position, and that's why you said the extent of the project is the extent of the take. But why isn't opposing counsel's argument correct, that that essentially weeds out of the statute any possibility of a revived consultation? The statute contemplates that it be revived. And to use your example, let's suppose there is, you know, 100 miles away, there's another ongoing project, and more owls have moved into your territory than you had anticipated. It simply removes the possibility of the statutorily required option. And that's of concern to me. It seems completely circular. Well, Your Honor, I guess I have two answers. The first answer would be withdrawing opposing counsel's marathon example. Not all biological opinions are marathons. A lot of them involve walking across the street. That is, in a lot of cases, the impacts are a few acres of habitat, which is nevertheless important and needs to be analyzed. But the ultimate extent of the impact can be analyzed in sanity.  But that's not what the statute seems to contemplate. It seems to contemplate that there be an opportunity in certain circumstances for a new consultation. And I don't understand where the statute says, except if we feel that we don't have to. Well, the difficulty with the owl is, it's very hard. The effects are on our sites, for example. You really would need a comprehensive demographic study of the owl population to check that. And we have eight demographic studies, including two right next door to this population here. So what we're doing is we're validating our habitat measurements so we can tell if that kind of thing is going on, feed it back into our habitat model. Well, it sure sounds like you have actually counted them. It makes it even less understandable why you haven't. Well, you're never actually counting the owls, because they're very hard to count. What you do is you see the trends in the population, you see if they're reproducing successfully. You don't actually get numbers out of this, but you do learn about behavior. And if, for example, you could get re-initiation, if, for example, you learn something in the adjacent demographic study area that tells you the owl is not doing what you thought it was doing, that could actually lead you to re-initiate in this area. So there is a feedback loop. But that isn't written into this, what you're telling me now, the opportunity to re-initiate if the owl's behavior changes or if it appears that more owls are moving into the territory or anything like that. One of the new information is one of the elements in the regulations. So it's in the statutory scheme. But where is it in this ITS? Your Honor, not every ITS has to have this kind of feedback loop. And let me bring you back to the example of walking across the street. If you had a single acre affected, there must be some ability for an agency that knows about the species and the habitat to get deference to its expert determination that this one acre, no matter what happens, there can't be a thousand owls or a thousand animals on this acre. That's the fact pattern that we've got here. Well, I could understand that if that's what the explanation was. That isn't actually the explanation in here, that this is such a small area that any effect is de minimis and we find that the statute isn't even intended to cover this. That's not the explanation in there. It's your explanation today. It's actually the explanation in the Jeopardy. The plaintiff's argument has the tail wagging the dog. The biological opinion is driven by Jeopardy analysis. It's a very long analysis, over 30 pages of discussion of Jeopardy issues in the opinion, referring back to numerous separate documents. The way the Fish and Wildlife Service administers the statute, it looks at Jeopardy in an extreme detail, and at the end of that analysis it may conclude that there's no need to institute a site-specific feedback loop of the type you have in mind here. And that's what's been done here. It's too burdensome and too difficult to do a demographic study range-wide. I mean, given the resources available, there are eight sites where these studies are done. They're very thorough. They're some of the best studies of any ornithological studies that exist. What is the legal effect, if any, of the fact that part of this was withdrawn in response to the previous remand? In our view, first of all, that was waived in the district court. What was waived in the district court? The plaintiffs never raised any objection in the district court to the mathematical question about subtracting 5,000 acres from 22,000. No, no, I understand that, but now we're supposed to decide if this incidental take statement is valid or not valid, and it was premised on something that is no longer true. And so I'm asking you how we take that into account, if we should, in determining whether it's valid. The agency that wrote the document believes it's severable. So we think we're entitled to a deference on the view that you sever out the 5,000 acres that was struck down in Giffords and Cho, and you're left with 17,000. And if you look at pages 41 and 48 of the opinion, you can see the numbers laid out very clearly there. So it's a pretty straightforward analysis to do. I just want to caution the court that, first of all, this is a regulation that's entitled to chevron deficit. The word extent is in the regulation. It means, as interpreted by the agency, habitat amounts. And there are a lot of biological opinions that are written in habitat terms. There are hundreds of opinions each year, many of which are in habitat terms. Were this court to adopt a well-meaning interpretation advanced by plaintiffs, the result would be rather burdensome for the agency. First of all, habitat may be the very best measure for the owl. It is the best measure. Everything about the owl is geared in habitat terms. So the result would be that the agency will have to shift its entire analysis and use some measure that's not as good. Or the agency will have to design a site-specific study of the kind that plaintiffs appear to want, and that study will distract the agency scientists and probably won't do any good. Certainly the various measures that plaintiffs have advanced, first of all, they have no scientific basis. None of these things that they've put forward, that they provide any scientific support for. Counting owls, as I've explained, you really can't do it. That is, the effects can't be measured except with a very comprehensive and expensive demographic study. Canopy closure, we're already doing. That's what the terms suitable habitat and dispersal habitat in the biological opinion mean, canopy closure. That's the exact meaning of the term. Plaintiffs don't provide any scientific reason to think that these other terms that they're advancing will be helpful to the agency's analysis. The agency should get some deference for its determination, which is rather comprehensive, that went into the National Northwest Forest Plan framework. The whole framework of the Northwest Forest Plan is based on owl habitat as divided between suitable and dispersal habitat. Um... I'd like to go back to the question of the independent figure. There's nothing in the statutory text. The word figure doesn't appear there. The text says, it sets forth the analysis of jeopardy. It says that if no jeopardy is found, the agency shall issue an independent take statement. So that statement is mandatory, and as interpreted by the agency. That statement involves the statement of the impact, and there are also measures, we're not denying, there are measures to minimize take, which do appear in this ITS, which are intended to facilitate owl dispersal. But there's a measure of impact on the owl. Now, impact is defined by the agency to mean amount or extent. And the regulations of the agency talk in great detail about how, for habitat-dependent species, sometimes a habitat measure is better. It's not feasible to go out and count the owls, and it's also not as good a measurement. If you take ten owls, you might be inadvertently giving more legal cover than is needed for a project whose exact scope can be defined in habitat terms. An ITS lifts criminal liability, and you want to tailor that lifting of criminal liability to the exact needs that you have. If there are no further questions, I guess I would express an agency's concern that this is an agency regulation, which is entitled to deference, and that we're not contending that planets can never seek a trigger. There may be biological opinions in which a trigger is appropriate or should be incorporated. The difficulty here is that they have not identified any actual practical difficulty with this biological opinion or any reason to think there'll be more take than the mathematically certain amount of take that has been ascertained by the agency. There are hundreds of biological opinions a year and many of which do involve rather important national activities, from highways to defense activities, and it would be troubling if the way that this wildlife service were to go about writing those biological opinions were to be affected by a well-meaning but scientifically unfounded analysis of how they should proceed. Thank you. Thank you, Counsel. You have some rebuttal time remaining. Thank you, Honor. I'd like to point out that the mathematically certain amount of take that the Fish and Wildlife Service is talking about is all the owls, and I'm not sure you need a lot of math to figure out that they've allowed the take of all the owls under this biological opinion. I agree with my opposing counsel that jeopardy here is the key, and that we have a biological opinion and an incidental take statement is part of that biological opinion. Where I disagree is how that system is supposed to work, and I believe Congress has set out a way to check the agency's hypotheses about whether the project is going to cause jeopardy or not. That is through the check of the incidental take statement, and where you have an incidental take statement which does not provide any check at all, which merely restates the scope of the project, you are missing a key element of that statutory scheme. It is no surprise then, when they are talking about their habitat models, that they come out with the same answer all the time because they are using the same model, and that the jeopardy analysis and the incidental take statement analysis have to be somewhat different in order to allow incidental take statements to fulfill that vital function of limiting take and checking the agency's best scientific guess about whether or not particular projects are going to cause a species to go extinct. There is no feedback loop in this biological opinion despite argument of counsel. New information may come up, and that is dealt with in a separate regulation. The new information regulation is 402.16b, and if new information comes up, then that is also a requirement for reinitiation of consultation. It cannot be the same requirement. It cannot take the place of section, little section A in that regulation, which is when you hit, when you go over the amount of incidental take. Their argument reads that out of the statute. While you're pausing, would you address Mr. Gray's position about the severability? Absolutely. We believe that the incidental take statement is not severable from the biological opinion, that, in fact, for the reasons he argued before he turned to that point, they are really one document, which is the jeopardy or no jeopardy opinion and the incidental take statement. Once they admitted that parts of that biological opinion were invalid under the Gifford-Penshaw task force case and on remand withdrew voluntarily those critical habitats. But that was with respect to a different portion. Different portion. Different geographical portion, right? Same geographical area, same universe of sales. These, originally this biological opinion. Well, different acreage. Different acreage, yes, sir. Yes, sir. But once they withdrew that, and if you go and look, and I urge the court to look at the biological opinion, you cannot separate out which parts are which of where the habitat was versus critical habitat versus non-critical habitat sales, all sales of which were important for the owl. We believe that actually required the invalidation of the incidental take statement right there and then. In fact, my opposing counsel argued that there's actually more legal cover than needed if you set a particular number of owls. They've certainly got more legal cover than they need now because they have an incidental take statement which allows the take from the entire project, not the amended project, as it were. We did not waive this argument. We did not raise it in the district court in the first time we were in district court because there was no voluntary pulling back of those critical habitat sales. The history of this case is this is the second time we've been before this court on remand, we certainly argued, and we pointed to that place in the docket in our briefs, we certainly argued that this kind of action should have invalidated the entire biological opinion and the incidental take statement. So I do not believe we have waived that argument. While the result of not having no check on, I believe the result of having no check in the incidental take statement is more than rather burdensome to the owl and to the forest that we're talking about. And while this is a legal question before the court, a fairly abstract question, this is one with real world impacts. We are talking about the logging of areas which are the last remaining homes for these species and in fact without that check on the best guesses of a service that may have the best interests of the owl at heart, we will never know if they are right or wrong until it is too late, and that is something that the Endangered Species Act is supposed to stop. Thank you. Thank you, counsel. The case just started. You need to submit it.
judges: Goodwin, Tashima, Graber